SHARP, Judge,
dissenting.
I dissent in this case, and protest what I feel is a gross miscarriage of justice. The majority seals its denial of relief for the wife in this case with the truism that a discretionary ruling by a trial court should not be overturned because of its “superior vantage point.” Query if any such presumption should be given in this case where the trial judge, himself, did not hear the testimony. The record is composed of four sessions of testimony taken before a Special Examiner, from August 29, 1980 to February 19,1981, and it is transcribed like depositions. The Examiner made no findings of fact. Therefore, the trial judge was in no better position than this appellate court to weigh contrary testimony and resolve issues of credibility. Julian v. Julian, 188 So.2d 896 (Fla. 2d DCA 1966); Sconyer v. Scheper, 119 So.2d 408 (Fla. 2d DCA 1960). I. Special Equity or Lump Sum Alimony
Based on the undisputed portions of this record, I think the trial judge erred in not making a more equitable division of the assets of the parties acquired and built up during the course of their fourteen year marriage — either through the mechanism of granting the wife a greater ownership interest in the assets of the pest control business, above and beyond her ten percent interest due to her stock ownership, by call *578 ing it a special equity or through lump sum alimony.[1]
The parties began their fourteen and one-half year marriage with few material possessions. When they married, the wife worked as a seamstress and the husband worked as a meat cutter. They pooled their earnings and both earned G.E.D. diplomas. The husband continued his studies and became licensed as a pest exterminator by the State of Florida. In 1974 or 1975 the husband and Mr. Roy Huling jointly began a pest control business named United Pest Control, Inc. The original capital for the Powell’s share of the business (some $6,000) was borrowed and the loan was secured by the parties’ jointly-owned car and stock, by some stock owned by the husband before the marriage, and by the wife’s fourteen hundred dollar ($1,400) certificate of deposit.[2]
When the pest control business began to grow, about six months after its inception, both Mrs. Powell and Mrs. Huling quit their jobs and began working in the office. They were the office staff for the new enterprise — the bookkeepers, office managers, secretaries and clerks. They became supervisors as other employees were added. The wives worked long hours and took work home when the business required it. In addition, they performed their functions and duties as homemakers.
United Pest Control, Inc. prospered. The Hulings took over the Jacksonville division and the Powells ran the division in New Smyrna Beach. Mrs. Powell handled all of the bill paying, payroll, and billing for both offices, and later performed similar jobs for Tillis and Master Shield, two spin-off business which were begun with assets and accounts from United. Mrs. Powell worked in this capacity until November, 1979, when she was hospitalized for a mental illness and the parties separated.
In 1979 United provided both families with a good living. The wives were paid twelve thousand five hundred dollars ($12,-500) each and the husbands each received a salary of thirty-four thousand three hundred dollars ($34,300). United was a Sub-Chapter “S” corporation, and Mr. Powell said he and Mr. Huling split any excess profits as dividends. The corporation was set up with Mr. Huling and Mr. Powell each owning nine shares, and the wives each owning one share. The Powells deposited their earnings into a joint account and used them for joint living expenses, to acquire other assets, and to fund United.
In 1979, while Mrs. Powell was hospitalized for a mental illness, the stock of United was sold to two purchasers of the business (one in Jacksonville and one in New Smyrna Beach), and all of its assets, consisting of the real estate where the business offices were located, were transferred to a partnership owned solely by Mr. Huling and Mr. Powell. They then leased the properties back to the purchasers. The fair market value of the New Smyrna property was twenty-one thousand dollars ($21,000). The purchasers of the business executed notes for the balance of the obligation owed— roughly seven hundred thousand dollars ($700,000) — payable to Mr. Huling and Mr. Powell. Mr. Powell’s share was later limited to the New Smyrna purchaser and business, and he was receiving three thousand three hundred dollars ($3,300) per month from the sale of United’s stock at the time of the dissolution.
There was some question, as the majority opinion points out, about how well the new purchasers were running the pest control businesses at the time of the dissolution hearings. But at the last hearing Mr. Powell testified he received the February 1981 payment on time, and the mid-monthly payment was only three days late. He testified *579 the note’s fair market value was forty-five thousand dollars ($45,000) and his share of United’s real estate was worth twenty-one thousand dollars ($21,000), net.
Even as a minority shareholder, Mrs. Powell should have fared better than she did under this judgment. The husbands both testified only they, not the wives, received dividends from United, and they used their cash distributions and United’s equipment and accounts to start other businesses in which only they, not their wives, had stock ownership. Some eight thousand dollars ($8,000) was put into Tillis in this manner. Although the final judgment recognized Mrs. Powell’s one-twentieth interest in United’s assets by awarding her one-tenth of the New Smyrna promissory note, it did not give her any interest in the spinoff business, nor in United’s real estate. Further, the final judgment did not scale down her fifty percent liability on a nine thousand seven hundred eighty-three dollar and twenty-nine cent ($9,783.29) bank loan to United secured by the parties’ jointly-owned twenty-four thousand dollar ($24,-000) certificates of deposit.
On the basis of this record, the denial of a special equity in the pest control business assets to the wife is contrary to established Florida case law. A wife who works in a family business and contributes her support and assets to it on a full-time basis should not leave the marriage with an interest measured by her stock ownership alone. Wives who work on both “fronts,” the home and the business, have been awarded special equities in the classical or pre-Canakaris sense. Carlton v. Carlton, 78 Fla. 252, 83 So. 87 (1919); Neff v. Neff, 386 So.2d 318 (Fla. 2d DCA 1980); Green v. Green, 228 So.2d 112 (Fla. 3d DCA 1969). Or, in its discretion, the court could have awarded the wife lump sum alimony to equalize somewhat the distribution of marital assets in this case. Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980); Roffe v. Roffe, 404 So.2d 1095 (Fla. 3d DCA 1981); Cowan v. Cowan, 389 So.2d 1187 (Fla. 5th DCA 1980). Failure to make any award here to the wife beyond her one-twentieth stock ownership in the note appears to me an abuse of discretion, particularly since the trial court also declined to award the wife any periodic alimony.
Inexplicably, this court had no problem recently overturning a trial court’s denial of special equity to a husband in Hipps v. Hipps, 418 So.2d 1234 (Fla. 5th DCA 1982). The husband in Hipps worked at a blue collar job, and after work helped build the parties’ marital home on land belonging to the wife. He did five thousand dollars ($5,000) labor on the home and helped pay the construction mortgage. This court reversed, holding the husband was entitled to a special equity in the marital home property, to the extent of a one-half ownership interest in it. This decision is in apparent conflict with Gallagher v. Gallagher, 399 So.2d 75 (Fla. 5th DCA 1981), and Smith v. Smith, 418 So.2d 1053 (Fla. 1st DCA 1982), and the cases cited therein. I agree with the result in Hipps, but would characterize the award as equitable distribution to a spouse not entitled to alimony — a remedy not foreclosed by Canakaris. See Thomas v. Thomas, 418 So.2d 316 (Fla. 4th DCA 1982).
II. Permanent Alimony
In my view, the trial court also abused its discretion in not awarding the wife permanent alimony, or at least in not reserving jurisdiction to do so, because the evidence clearly showed there was a substantial question whether the wife would ever be able to support herself again.[3] I welcome the majority’s restatement of the judgment as constituting “rehabilitative” alimony (since that is better than nothing), although other than the wife’s right to live in the house for two years, there is no basis for such a view.[4] Rehabilitative alimony is no *580 substitute for an award of permanent alimony to a spouse who is disabled and in need. Colucci v. Colucci, 392 So.2d 577 (Fla. 3d DCA 1981).
The record showed that at the time of the final hearings, the wife was not employed, and that since she stopped working for United in 1979 she had not earned any income. I cannot find any basis for the majority opinion’s statement that the wife “was working daily at time of trial.” The only testimony which tends to support that conclusion is Mr. Jennings’ statement that Mrs. Powell visited him at his business in 1979 and handed out business cards for the ABC Travel Agency, showing herself as a “consultant.” When he called twice and tried to order tickets through her some months later, he was told she was not there. She never earned the first commission from ABC.
Other than the temporary alimony awarded, the wife testified (without any dispute) that she had no other income. Mrs. Powell’s living expenses, as established by her testimony and financial affidavit, total more than the final judgment permits her to collect from her stock interest in United.[5] She testified that when Mr. Powell failed to pay the previously ordered temporary alimony, she had difficulty buying groceries and other necessities and she was in default on the car and house payments.
The record did not establish any realistic prospect for Mrs. Powell’s becoming self-supporting. Both parties testified Mrs. Powell has a history of mental illness. She was hospitalized in November and December of 1979 under the Baker Act. Mr. Powell testified she was diagnosed as being a schizophrenic paranoid type and delusional.[6] He said she was violent and had a “major mental disorder.” However, he did not relate her inability to function either on a social level or in the work force to her disorder. Mrs. Powell testified she had left job applications with banks and a hospital for work in 1979, but after her second hospitalization she felt she could not work. She even required help running her household and buying groceries, and, throughout the span of the hearings, she was under the care of a psychiatrist.
Mrs. Powell’s condition is, unfortunately, typical of a person with her kind of mental illness.[7] It is rarely curable,[8] and there *581 usually is marked impairment in role functioning as a wage-earner, student, or homemaker.[9] Both parties agreed Mrs. Powell was, at the time of the final hearing, sufficiently disabled to qualify for social security disability payments. If that alone- does not establish a need for permanent alimony, I confess I do not know what does. There was no countervailing testimony that Mrs. Powell has any prospects for becoming self-supporting in the job market. Under these circumstances, it is an abuse of discretion not to award permanent periodic alimony, if the former husband can contribute to her support.[10]
In this case the record showed Mr. Powell had a net weekly income of eight hundred sixty-five dollars and thirty-eight cents ($865.38) from the United note and real' estate rentals. He testified the collectibility of the note was “shaky” and he was having to work in the business to ensure its ' payment. However, the note was current at the final hearing, and semi-monthly payments had been made consistently since the dissolution hearings began — a span of fourteen months. In any event, Mr. Powell was healthy and he held a license in the pest control business. He also held security interests in United’s stock and assets that would permit him to take it back and run it. He was clearly far more able to earn a living than was Mrs. Powell.
Mr. Powell’s financial affidavit showed he was having difficulty paying Mrs. Powell one thousand three hundred dollars ($1,300) in temporary alimony per month, and maintaining his new wife and child and eighteen year old son. He testified the liabilities shown on his affidavit were either related to his new family, or were related to the sale of United and litigation arising out of the sale and prior debts of the business. Although the record showed Mr. Powell was having financial problems meeting all of his obligations, his income and earning ability were far superior to Mrs. Powell’s.[11] The disparity in their financial situations after the dissolution is too great to be equitable. Holland v. Holland, 406 So.2d 496 (Fla. 5th DCA 1981); Cowan v. Cowan, 389 So.2d 1187 (Fla. 5th DCA 1980); Aguiar v. Aguiar, 386 So.2d 280 (Fla. 4th DCA 1980); Bradley v. Bradley, 385 So.2d 101 (Fla. 5th DCA 1980).

. See Weider v. Weider, 402 So.2d 66 (Fla. 4th DCA 1981); Aguiar v. Aguiar, 386 So.2d 280 (Fla. 4th DCA 1980).

. The majority opinion says the United business was begun with the husband’s assets owned prior to the marriage. I dispute that is a fair statement of what the record shows, but even if it were true, that is no basis upon which to deny a special equity or equitable distribution to a spouse, given other relevant factors as were shown in this case.

. Connor v. Connor, 386 So.2d 595 (Fla. 5th DCA 1980).

. The other grounds given were: payment of liabilities and accrued arrearages; and the award of 10% interest in the note. The $100,-000 in liabilities related primarily to United *580 Pest Control debts and liabilities and those incurred by the husband for his second wife and family. Accrued arrearages of alimony are not “rehabilitative” alimony, but a debt owed which the court cannot, without violating due process, fail to enforce. The “award” of the wife’s ten percent interest in the note was just part of what she was entitled to, due to her ten percent stock ownership in the corporation.

. Her share of the mortgage on the marital home and her car payments together exceed her monthly three hundred dollar ($300) share of the promissory note, without even considering her other living expenses.

. The husband’s Petition for Dissolution alleges:
The Respondent has a history of mental illness and has been institutionalized on different occasions for treatment. Most recently, Respondent was admitted to ... Halifax Hospital Medical Center ... where, on November 13, 1979, a “Baker Act” hearing was held in the psychiatric unit of that hospital.... Respondent [was diagnosed] as suffering from schizophrenia, paranoid type, and being delusional.... Respondent is likely to injure herself or others and may not be able to adequately care for herself.
At a hearing in 1980, Mr. Powell was asked: Do you feel she is still likely to injure herself or others and may not be able to adequately care for herself as you allege in your petition?
He answered:
Yes, I do. I don’t know about caring for herself but I’m sure she maybe along the road may injure somebody. I’ve been told that by a qualified physician, so I’ve got to go along with it.

. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3rd ed. 1980). This manual describes Schizophrenia Paranoid Type as being characterized by:
Sudden and unpredictable change in effect involving inexplicable outbursts of anger.... Nearly always there is some disturbance in self-initiated goal-directed activity, which may grossly impair work of other role functioning. This may take the form of inadequate interest or drive or inability to follow a course of action to its logical conclusion. Id. at 183.

. Id. at 185.
Invariably there is impairment in several areas of routine daily functioning, such as *581 work, social relations, and self-care. Supervision may be required to ensure that nutritional and hygenic needs are met and to protect the individual from the consequences of poor judgment, cognitive impairment, or actions based on delusions or in response to hallucinations.

Id.

. Id. at 189.

. Weider v. Welder, 402 So.2d 66 (Fla. 4th DCA 1981); Burke v. Burke, 401 So.2d 921 (Fla. 5th DCA 1981); Gerber v. Gerber, 392 So.2d 317 (Fla. 4th DCA 1980); Colucci v. Colucci, 392 So.2d 577 (Fla. 3d DCA 1980); G’Sell v. G’Sell, 390 So.2d 1196 (Fla. 5th DCA 1980). See O’Neal v. O’Neal, 410 So.2d 1369 (Fla. 5th DCA 1982); Hinebaugh v. Hinebaugb, 403 So.2d 451 (Fla. 5th DCA 1981). See also this court’s recent decision in Nichols v. Nichols, 418 So.2d 1198 (Fla. 5th DCA 1982).

. Part of Mr. Powell’s difficulties were self-created. It was his decision to sell the successful pest control business, which had provided him with a good income source. Further, his newly acquired obligation to support his second wife and child, although obviously affecting his ability to pay alimony, should not totally extinguish his obligations to Mrs. Powell.